EXHIBIT
**2**

**Case**
Timothy Short
Case No. 4:22-cv-01117-SEP

**Physician Author**
Joel Blackburn, D.O.
Columbia, Missouri 65203

**Requesting Entity**
Todd C. Werts, JD
Lear Werts, LLP

**Introduction/Purpose of Report**

Thank you for the opportunity to review this case and provide my professional medical opinion(s). You have asked me to review this case for you regarding Timothy Short, who is deceased, and was incarcerated at the St. Charles County Jail at the time of his death.

**Professional Qualifications**

I have a Doctor of Osteopathy degree from Des Moines University College of Osteopathic Medicine in Des Moines, Iowa. I am board certified in Internal Medicine with the American Osteopathic Association.

I have practiced office and hospital-based medicine providing primary and critical care medical care. I have practiced Emergency Medicine for over 24 years. I was the facility medical director for the emergency department at Capital Region Medical Center in Jefferson City for nearly 2 years during the COVID pandemic. I have treated hundreds of patients with COVID infection.

I began practicing Correctional Medicine in 2003. I practiced as an employed physician for Correctional Medical Services (CMS) at Moberly Correctional Center (MCC) for approximately one year from 2003-2004. I was the Assistant Medical Director at MCC. In April of 2004, I became the medical director of the Boone County Detention Facility in Columbia, Missouri. I owned and operated the contract at this facility d/b/a Professional Correctional Medicine. I was the full- time director from April of 2004 to June of 2016.

My duties as medical director of Boone County Jail was management of both the medical and mental health departments. I established protocols, policies, procedures, and pre-approved medication lists for the medical care of the inmate patients. I assisted in risk management services, cost containment/utilization management, outreach services such as the Stepping-Up Initiative, and networking with local physicians, hospitals, and HIV charity services. I counseled with local prosecutors, public defender's office, county counsel, county commissioners, county auditor and budget advisor for the institution. I helped manage delivery of care, and medical reimbursement for services received by outside facilities. I assisted in nurse hiring, and I was instrumental in changing the way the county delivered medical care to incarcerated patients. In addition, I advised and assisted the county in changing the delivery of behavioral health care to their patient

population. I provided education and training to the county correctional officers and nursing staff. My educational focus for nursing staff was based upon those issues that are of particular risk for the inmate patient population which were serotonin syndrome, neuroleptic malignant syndrome, dystonic reactions, IV drug abuse and its consequences, opioid and alcohol addiction, drug and alcohol withdrawal, Hepatitis C, and HIV. My focus for correctional officers is avoiding implicit biases/cognitive biases which impede our decision-making capability in medical care and delivery of the inmate patient and providing for the safe and quality care of their patients.

**Assumptions**

My opinions are formulated upon the assumption that I have been provided any and all relevant documentation available in the case and that said documents are accurate. Therefore, my opinions may be revised based upon additional or new information or documentation. This report is a preliminary report. As such it will contain only the most relevant issues related to this case.

**Disclaimer**

My independent opinions are given to a reasonable degree of medical certainty, and to a reasonable degree of certainty in the field of medicine and corrections unless otherwise stated. My opinions are based upon my collective knowledge, experience, education, training, information, and review of the documents referenced in this report. I have specific experience, knowledge, and training in the field of correctional medicine.

This report attempts to highlight and discuss pertinent facts related to the case that were important in developing my opinions and is not intended to be construed as all inclusive. Every attempt has been made to report, discuss, and transmit the facts as accurately as possible. However, unintentional errors may occur and will be corrected and revised as needed.

I do not ask for monetary reimbursement during my initial review of a case prior to determining its merits. I do feel this case has particular merit. I have received payment to thoroughly review this case, and my fee schedule has been included. However, my fees and reimbursement for services are not contingent upon the outcome of any case.

**Prior Case Reports or Testimony**

- Bennett v Haas, et al; 2:10-cv-04149-FJG; Smith Lewis, LLP. Spinal cord compression/stenosis.
- Jerry Whisler v Advanced Correctional Healthcare, 19MG-CC00005; Carson & Coil. Orchiectomy.
- Patty Decker v Correct Care Solutions, LLC, Akinrinola Fatoki, M.D., et al; 19JE-CC00185; Millikan & Wright, LLC. Narcotic overdose.
- Cassandra Cox v Callaway County, Missouri., et al; 2:18-cv-4045-0405-NKL; A.G. Laramore, LLC. Methamphetamine overdose and cardiac arrest.
- Nicholas Pickett v Moberly Correctional Center/Corizon; A.G. Laramore, LLC. Fentanyl overdose and death.
- Estate of Dalynn Kee v Macon County and Community Health Improvement Center, Inc; Fred Schlosser with Gates Wise Schlosser & Goebel Law Firm. Death Secondary to Opioid Withdrawal at Macon County Jail.
- Brenda Givens, et al., v St. Louis County, et al; 4:18-cv-01732-SPM; Endocarditis and subarachnoid hemorrhage. Brown & Crouppen Law Firm.
- Edward L. Harris, Sr., and Deanna Harris v TEI (ES), LLC d/b/a Lumiere Place Casino & Hotels, 1822-CC11048. Pediatric Drowning. Brown & Crouppen Law Firm.
- Estate of Alex Billmeyer v Dubuque County Sheriff Department, et al; Case No. 2:20-cv-01007-CJW-MAR. Methamphetamine toxicity/overdose. Nathan Mundy, JD.
- Janet Milashoski v. Thorek Memorial Hospital, et al; Case No. 2019L002239. Drug overdose. Law Offices of Larson Magazine, LLC.
- Brenda Givens, et al., v. STL County, et al., Case No. 4:18-cv-01732-SPM. Endocarditis and subarachnoid hemorrhage.
- The estate of Daniel D. Codington v. United States of America, University of Massachusetts Medical School, et al., Civil Action No. 4:12-cv-00007. Bertram Law Group. Abdominal wall hemorrhage in setting of chronic anticoagulation.

**Documents Reviewed/Relied Upon**

Documentation used in establishing my medical opinions are as follows:

1) Intake forms
2) Segregation form
3) Booking checklist
4) Release checklist
5) St. Charles County medical files
6) St. Charles County shift records
7) St. Charles County supervisor reports
8) Plaintiff's interrogations
9) Defendants' response to interrogations
10) Medical records Barnes-Jewish
11) Medical records SSM Health St. Joseph Hospital
12) Medication list
13) Patient phone calls to spouse
14) St. Charles County Medical Policies
15) Deposition of Sarah Broadwater
16) Deposition of Virginia Parker
17) Deposition of Stacy Kent
18) Deposition of Jandi Cox
19) Deposition of Patricia Garrison-Metzger
20) Deposition of Jami Hohl
21) Deposition of Nicole Cook
22) Deposition of Michael Davis
23) Deposition of Megan Johansson
24) Deposition of Kenneth Seghers
25) Nurses quick reference guide
26) Staff emails
27) Patient chart access
28) Facility photos
29) Interview of I'Esha Shelton Short
30) Mo. Dept. of Health and Senior Services General Documentation Guidelines
https://health.mo.gov/living/ipha/phnursing/documentation.php
(last accessed June 29, 2024)
31) Death certificate

32) Strausz S, Kiiskinen T, Broberg M, et al Sleep apnoea is a risk factor for severe COVID-19 BMJ Open Respiratory Research 2021;8:e000845. doi: 10:1136/bmjresp-2020-000845 (Jan.12, 2021)
33) NIH, Coronavirus Disease 2019 (COVID-19 Treatment Guidelines, p. 41, (June 17, 2021)
34) National Commission on Correctional Healthcare, Clinical Care of the COVID-19 Patient, January 12, 2021

**Questions**

I will be addressing the following questions in my expert opinions regarding the death of Timothy Short:

1) Was there a delay in appropriate medical care?
2) Did the care Mr. Short received fall below the standard of care?
3) Was there deliberate indifference?
4) Did the delay in care cause, or contribute to cause, Timothy Short's death?
5) Was the treatment Mr. Short received at St. Joseph hospital reasonable and necessary to treat and stabilize his condition, and were they in accordance with accepted standards for his condition and diagnosis?
6) Were the medical costs that Mr. Short accrued at St. Joseph Hospital appropriate and necessary for treatment and stabilization of his condition?
7) If Mr. Short had been transferred to the ED on September 13, 2021, would that have impacted the duration of his treatment at the hospital?

**Background of Events and Timeline**

Timothy Short was a 46-year-old African American male incarcerated at St. Charles County Jail at the time of his death. He entered the facility September 9, 2021. The day prior to this he was test positive for the SARS-CoV-2 (COVID-19) virus. He developed progressive respiratory symptoms which included shortness of breath, low oxygen levels (hypoxia), and diarrhea. The infection was particularly dangerous with his comorbid illnesses which included obesity, coronary artery or heart disease (CAD), chronic kidney disease, and obstructive sleep apnea (OSA). The patient requested further medical treatment outside of the facility. However, the request was denied. He had several conversations with his wife, September 12, 2021, over the phone and stated that they were going to kill him there and that they were not treating him. He states his oxygen levels dropped into the 70's and he was instructed by nursing staff to stand up and breathe. His oxygen levels would drop with exertion, and he would become more short of breath. In his phone

conversation with his wife, he was also concerned that they had not prescribed his heart medications. The following is a brief timeline events:

9/8/2021: Diagnosed with COVID infection.
9/9/2021: Normal vital signs and minimal symptoms.
9/10/2021: Rapid heart rate and short of breath.
9/11/2021: Persistent shortness of breath and develops diarrhea.
9/13/2021: Progressive and worsening shortness of breath. Documented hypoxia and placed on supplemental oxygen.
9/14/2021: Patient's vital signs worsening with rapid heart rate and low blood pressure. Transported to emergency department by officer transport.
9/14/2021 at 1219 hours: Arrives at SSM Health St. Joseph Hospital and found to be in acute hypoxic respiratory failure secondary to COVID-19.
10/18/2021: Patient's symptoms could not be stabilized, and he was pronounced dead with his wife and son present.

**Policy and Procedure Violations:**
Access to Care Healthcare Services Policy #1406
5. Emergency medical needs are tended to as soon as the need is identified (SCC000258).

   1. This policy was violated because the patient developed an emergency medical need on 9/10/2021 which was not acted upon.

6a. A medical practitioner is on-call and available by phone for consultation with medical staff 24 hours a day, 7 days per week.
   1. This policy was violated since there is no documentation that any staff member such as officer or nurse contacted a physician or medical provider with concerns or recommendations for medical care.

Pandemic Emergency Response Plan (Medical) Policy #1412 (SCC000268)
1, 2. Coronavirus Summary.
   1. Policy violated. This policy specifically outlines patients who have serious outcomes such as those with heart conditions, chronic lungs disease, and diabetes. It states that **emergency warning signs** for COVID-19 are trouble breathing, and that those patients should get medical attention immediately.

~ 7 ~

Transport to Emergency Medical Facility SCC000317

This policy should delineate certain conditions that require ambulance transport. All patients with respiratory distress must be transported by ambulance or Emergency Medical Services (EMS) and qualified personnel. As the policy is written, it allows for medical staff, apparently under any circumstances, to determine whether an ambulance is necessary for transport to a hospital. Had this policy required patients with respiratory distress to be transported by ambulance, Mr. Short would have been transported to the hospital and emergency department more efficiently, with oxygen, and received treatment and medical support in route.

**Discussion**

Medical Care and Risk Factors

The medical care Mr. Short received at St. Charles County Jail was inadequate. The patient was diagnosed only six days prior to hospital transport. There was ample time to be proactive and intervene in his medical care, and to prevent a decline in symptoms. It was the day after his diagnosis when he developed a rapid heart rate and shortness of breath. On this day, the decision should have been made to send him to the emergency department (ED) for further evaluation and possible admission. Unfortunately, his symptoms worsened, and he had several comorbid illnesses which contributed to his decline such as his obstructive sleep apnea (OSA), and his race (not to mention his obesity and heart disease). African Americans are more than five times likely to be incarcerated compared to their white counterparts, and they are more than two times likely to die from COVID related illnesses. Had the jail medical personnel intervened appropriately, I believe it is more likely than not that he would have survived.

Systemic Inflammatory Response

The day after his diagnosis he was experiencing Systemic Inflammatory Response System (SIRS). Without appropriate intervention, SIRS becomes sepsis, and then death. He developed diarrhea the following day and persistent shortness of breath, but still no treatment was provided. The nursing and medical staff continued to ignore and downplay his symptoms and comorbid illnesses. His morbid obesity, OSA, chronic kidney disease, and heart disease would adversely affect his outcome for survival. Obstructive sleep apnea, in and of itself, at times requires oxygen supplementation, but more importantly positive pressure ventilation with a CPAP

(continuous positive airway pressure) machine which helps keep airways open especially when the patient sleeps. The patient had been prescribed a CPAP machine in the past, but the medical department made no effort to obtain a CPAP machine for Mr. Short. Therefore, when he slept, he would most likely become hypoxic and develop further mucous plugging increasing the stress to his heart and increasing the chances of developing bacterial pneumonia.

When his breathing difficulty worsened on September 13th, Nurse Megan Johansson simply suggested he take larger breaths to which the patient responded that he couldn't. She placed him on supplemental oxygen, but the patient needed ventilation as well and inpatient COVID treatment with Decadron, BiPAP, and Remdesivir as standard of care. Nurse Jami Hohl was dismissive of his symptoms and subjective complaints of dyspnea and stated that Mr. Short did not appear to be in any distress and seemed to be faking his breathing difficulties. The following day, his apparent symptoms, which were falsely attributed to faking, progressed to where he had to be sent to the ED and he was diagnosed with acute respiratory failure and sepsis.

Hospital Care and Oxygen Discrepancy

At St. Joseph Hospital, where he was transferred, he was found to be hypoxic on room air (pg. 58 PDF St. Joseph EMR). Per the jail records, the patient was to be transported by officer transport with oxygen. It is unclear whether he arrived at the hospital on oxygen based on the ED records. One thing that is clear, based on the evaluation at the hospital ED, is that the evaluation by nurse Jami Hohl on 9/13/2021 is unreliable. She states that Mr. Short was 99% oxygen saturation on 2 liters per nasal cannula (pg. 70 PDF Jail EMR). The ED records state the patient arrived at their department in the mid-80s and was placed on airvo which is high flow oxygen. This raised his oxygen saturation to between 92-94% and it was previously in the 80's on 4 liters from the jail (pg. 62, PDF St. Joseph EMR). Therefore, Nurse Hohl's documentation is questionable and highlights the concern I have with her biased observation that the "…Patient was not in any distress. But had shallow breathing that appeared to be intentional" (pg. 70, PDF Jail EMR). Because Timothy Short's transfer to a higher level of care was delayed, he was developing ARDS (acute respiratory distress syndrome) from viral pneumonia. Mortality from ARDS can approach 50% and leads to sepsis and multi-organ failure. Timothy Short was scared. This was apparent from his conversations with his wife. He was afraid he would die, and I am sure he must have been frustrated because

he felt he needed medical attention, but the jail's medical department was not listening to his concerns, and he did not have the freedom to seek care on his own volition. Furthermore, at the hospital, he wanted to speak with his wife, but he was denied this privilege as well. Isolated and alone he was left to the care of the physicians at St. Joseph who did everything they could to save his life. He was given all the appropriate care and medications. Unfortunately, it would be too late because he had developed multi-focal COVID viral pneumonia. He progressively declined and was placed on a ventilator and later ventilated through a tracheostomy. His kidneys declined and he developed multi-organ failure. He died with his wife and son present, having never been able to tell her he loved her one last time, on October 18, 2021, which was nearly one month from the time he arrived at the hospital.

<u>Depositions</u>
I reviewed 10 depositions, but I will only discuss those I feel were the most relevant to his demise and fell below the standard of care.

*<u>Megan Johansson, LPN</u>*: The deposition of nurse Johansson paints a description of an extremely biased and overconfident nurse. She overrates her ability to determine sick from not sick. As a physician who has practiced emergency and critical care medicine for 25 years, I have realized I know far less than I once thought. Attending and well-seasoned physicians caution resident doctors about falling victim to this bias, and remind them that "they don't know, what they don't know." Academically, the professional term for this bias is called the Dunning-Kruger effect. It is possible to fall into this cognitive bias after having a little knowledge or experience in a certain specialty, and the mind is tricked into thinking it knows more than it does. Nurse Johansson could be the poster child for this bias. She states, "When you're a corrections nurse…you can tell a genuine ailment from not a genuine ailment usually…you kind of get a sense of when somebody is trying to make themselves out to be a little sicker than what they tend to be…" (pgs. 130-131). She is unknowingly describing heuristics which are rules of thumb that our brains use to make decisions efficiently. The problem with heuristic decision making is they are subject to implicit biases. Megan was also falling victim to the anchoring and availability biases which causes us to rely too heavily on information that we may have received early in a decision-making process and what is readily available. It leads to ignoring new information that can change our decision-making process or cause of to consider other possible etiologies. Since Mr. Short was an

African American inmate, he was subject to biases in relation to his race and perception that all inmates are dishonest and overexaggerate symptoms in order to get out of jail. It is a problem that I educated my nursing staff, and correctional officers on when I was the medical director of Boone County Jail. It is true that incarcerated patients can be dishonest and less than forthcoming. However, if you base your medical decision making upon those assumptions, rather than giving incarcerated patients the benefit of a doubt, you will miss important problems and either harm or kill patients. So, when Nurse Johansson states on page 131 that "…generally speaking, you kind of get a sense of when somebody is trying to make themselves out to be a little sicker than what they tend to be, especially when the vital signs are just that, they're vital signs…" she should have taken her own advice because on September 13, 2021 she had a patient stating he could not breath, she documented short shallow breaths indicative of someone in respiratory distress, and she indicates that the patient has poor air movement bilaterally in the base of the lungs with a vital sign showing oxygen in the 80's, it is inexcusable that she does not contact a physician regarding the hypoxia, the difficulty breathing, and the fact that she started supplemental oxygen on a patient without a physician's order. She is to be a patient advocate. She now has a patient with COVID, who is hypoxic, states he cannot breathe, and has a history of OSA and multiple other comorbid issues, and she does not notify the physician on call. To state that these actions are concerning would be an understatement. Further confirmation in her inability to determine sick from not sick is the fact that his oxygen level continued to decline and dropped to 79% on 3L per NC and she increased it to 4L.

 She seems to be able to determine the severity of a patient's respiratory symptoms without performing a full physical examination, complete diagnostic and laboratory workup, or even a complete set of vitals. On page 97-101 of her deposition, she is placing the patient on 3 LPM of oxygen per nasal cannula (NC) which raises his oxygen saturation from 84-87% to 92%. However, on page 100, she states "…he was just choosing to kind of take shallow breaths…" She states when she auscultated his lungs in the bases, "…I'm not hearing much air movement." (pg. 98). She determines this is because Mr. Short is refusing to take large breaths and is taking shallow breaths on purpose to overrepresent his condition. She mentions he has no difficulty with conversation, and that he is not using accessory muscles of respiration. This is problematic because you cannot determine if someone is using accessory muscles unless you disrobe them so that you can actually view the accessory muscles since the majority of those muscles are below the neck in the

chest, between the ribs, diaphragm, and abdomen. On page 131, she continues to endorse that she makes biased judgements.

She also fails to consider other possibilities of Mr. Short's symptoms, which is called a differential diagnosis. Timothy Short had a history of cardiac disease and congestive heart failure (CHF). His symptoms could have been due to cardiac ischemia or acute CHF. He was immobile and had COVID which both were a risk factor for a pulmonary embolism. Never were alternative problems considered, nor investigated. Other than administering supplemental oxygen the day before he was sent to the ED, he never received medications including his cardiac medications, a CPAP, an EKG, blood work to rule out other etiologies of his symptoms…nothing.
She also apparently does not know the difference between an oxygen tank and an oxygen concentrator which she states she used. However, everyone states in their depositions that they only had oxygen tanks at the facility. Therefore, she is either not being truthful, or she has very little experience with assessing patients with hypoxia and administering oxygen because most well trained and attentive nurses would confidently know the difference between the two. In addition, She is an LPN, and cannot perform certain tasks without oversight or assistance of a RN (Registered Nurse). Once she starts Mr. Short on oxygen, which is a medication and requires a physician's order, she fails to notify Dr. Andreoff of the patient's declining condition, his new oxygen requirement, and to obtain a verbal order for administration of the oxygen and other diagnostic, laboratory, and medication orders he may recommend, including transfer to the ED for further evaluation and treatment.

   *Jami Hohl, RN and Nicole Cook, RN:* I am discussing these two depositions together because they are intertwined and contradict each other regarding their care on September 13, 2021. They both cannot possibly be telling the truth regarding their care of Mr. Short that evening.

Nurse Hohl states on page 103 of her deposition, that she documented the nurse assessment for Nurse Cook. In the jail electronic medical record (EMR) SCC 000368, she documents that Mr. Short had "shallow breathing which appeared to be intention." She will not comment on what Nurse Cook meant by this but states that "…there's no way to know if somebody's intentionally doing anything…," and "That's what she told me and that's what I wrote…" (Hohl Deposition pg. 103). Nurse Hohl responded to an email sent by Jandi Cox which inquired why Mr. Short

had not been seen yesterday evening and why he did not have a COVID assessment. She responded nearly 12 hours later and stated that Nurse Cook did see the patient at approximately 2130 hours, and his oxygen saturation was 99% on 2 Liters. (Hohl Deposition pgs. 88-92).

However, Nicole Cook, in her deposition, denies directing nurse Hohl to document her assessment of Timothy Short. Furthermore, she states Jami Hohl performed the entire assessment and she did not even enter the cell (Cook Deposition pgs. 83-86). I have no way to determine the truth here. I struggle to believe that either Nurse Cook, or Nurse Hohl have no recollection of Timothy Short and their involvement in his care. However, it is my opinion that one or both of them is hiding something. In either case, their care and actions were negligent, and they were deliberately indifferent to his condition where either one or both of these nurses believe the patient was exaggerating his symptoms for secondary gain. My opinion is that they are both being deceitful and that it is possible, and even more likely than not, that neither of them saw the patient. I believe Timothy Short was telling the truth, and that no one saw him that evening, and to support this opinion refer to the medication administration record (MAR). There is documentation of medications being administered that morning by Megan Johansson, but no documentation of medication administration that night (Jail EMR pgs. 60-62; confidential SCC 000420-23). Therefore, it is also more likely than not that he went the entire evening and night without oxygen because in Nurse Cook's deposition she stated she saw no oxygen tank in his cell (pgs. 62, 86). Now, when this occurred is unclear, but if Nurse Johansson administered oxygen that morning, then it would have lasted less than 8 hours if it was a full tank. During my research, I have found that most hospitals and facilities use E tanks, and based upon a 2-4 LPM rate, they can last between 4-8 hours. I have verified this with multiple sources including online calculators, critical care nurses, and even patients who use oxygen continuously. The majority of the nurses agreed that there were no oxygen concentrators, and Jami Hohl on page 74 of her deposition was shown a picture of several sized tanks and stated the E tank appeared similar to the size they used. Therefore, Timothy Short on September 13th, was not assessed, received no medications, and went without supplemental oxygen for approximately 12 hours in a small cell, with no further treatment, and lying on a concrete bench barely wide enough for him to lie on his side.

The documentation by Nurse Hohl, reporting Nurse Cook's assessment, that the patient's oxygen saturation was 99% on 2 L is also impossible. His oxygen saturation had never been that high even on supplemental oxygen, and based upon his size, comorbid diseases, and current illness, is improbable. This underlines my opinion that the assessment either was not performed, was not performed well, or is intentionally misleading; especially, since it was documented after the fact when they knew Timothy Short had been transferred to the ED. Furthermore, Mr. Short had a time critical diagnosis (TCD), and these actions, however they occurred, denied him the care he needed when he needed it.

Nurse Hohl and Cook also violated the General Documentation Guidelines for nurses by the Missouri Department of Health and Senior Services. There are 20 guidelines. Number 6, 11, 12 and 20 state, "Do not give opinions…," "Never document for someone else or sign another nurse's name in any portion of the medical record," Documentation should occur as soon after the care given as possible," and "REMEMBER, if you didn't document it, it didn't occur." Jandi Cox actually, as their supervisor, had a duty to report Nurse Hohl, and Nurse Cook to the nursing board.

Interview I'Esha Shelton

I participated in a phone interview with the wife of Timothy Short, I'Esha Shelton. Mr. Short had obstructive sleep apnea, and it became clear early on that those patients had a higher morbidity and mortality associated with COVID. Experts knew early on that patients with COVID and OSA who used their CPAP when they slept substantially decreased their risk of death (BMJ Strausz S, et al). Mr. Short had a CPAP machine, according to his wife, it was available, and he used it occasionally. She stated he did not use it as much as he should because he was up during the night often working, but commented that when he did use it, he said he felt better and that it helped. During her conversations with him, he stated that his oxygen levels were low, and they would not believe him, assumed he was exaggerated his symptoms, and he felt when they started the oxygen, that it was not enough to correct his symptoms. This is not the first time Mr. Short had been in jail. I asked if he had ever faked a medical illness or symptom with the intention of getting out of jail, and she stated no. A few months prior to his arrest and incarceration, he had a cardiac stent placed at Barnes-Jewish, and he was diagnosed with congestive heart failure (CHF). He was prescribed heart protective medications, aspirin, and plavix. They would not give him the medications because he did not bring them with him,

and/or they were not in the original bottle. However, they never called to confirm or validate the medications with her, nor any of his doctors. I'Esha called every day to see how he was doing, and they would never relay any information to her other than he was still in custody. I find this inappropriate. First, there is no HIPAA compliant issue related to speaking with a family member regarding the medical care of a patient; especially when that discussion is most likely to assist in improving the patient's care. Mrs. Shelton states that they only allowed them to bring him his medications the day before he was sent to the ED. In fact, the medical department never notified or discussed his medical condition with the wife, and she did not know he was sent to the hospital and admitted until after he had been there for two days, and they allowed him to call her. I inquired whether he would have sought care for himself had he not been incarcerated. She stated yes and said that he actually was diagnosed with COVID several days prior to his arrest, and she developed symptoms first. He made her go to the ED where they offered her admission, but she declined. Mr. Shelton stated when she spoke with him on the phone, his voice had changed. He was usually jovial, but she could tell he was scared, and she could hear it in his voice. She tried to notify the staff of her concerns and to get him help, including calling a friend of theirs who was an attorney. The friend spoke with the jail, but they continued to be resistant regarding getting his heart medications, and further treatment.

**Summary**
1) Was there a delay in appropriate and timely medical care?
   a. Yes. The patient was diagnosed with COVID six days prior to transfer to the ED. This is sufficient time to intervene. It is my professional opinion based upon my education, experience, and review of this case, that the care provided to Timothy Short by the entire nursing staff at the jail fell below the standard of care.

2) Did the care Mr. Short received fall below the standard of care?
   a. Yes, and while I believe the following nurses did not demonstrate deliberate indifference, their care was substandard, and illustrates the deliberate indifference demonstrated by St. Charles County and Accountable Health Care in failing to train, supervise, and provide the medical staff with the education, direction, and oversight they needed to care properly for patients infected with COVID-19, and especially those with multiple comorbid issues such as Mr. Short.

i. Stacy Kent, RN failed to respond on 9/11/2021 and 9/12/2021 when patient complained of shortness of breath, dizziness, body aches, loss of sense of taste, and diarrhea (St. Charles County Jail medical record, confidential SCC 000371 and 000373).

ii. Michael Davis, RN fails to respond when patient has a complaint of occasional shortness of breath (St. Charles County Jail medical record, confidential SCC 000372).

iii. Patricia Garrison-Metzger, RN fails to respond on 9/11/2021 when patient complains of diarrhea and shortness of breath (St. Charles County Jail medical record, confidential SCC 000374).

iv. Dawn Moses, LPN failed to respond on 9/10/2021 when patient presented with a heart rate of 108 bpm. A rapid heart rate should never be ignored (St. Charles County Jail medical records, confidential SCC 000377).

v. Doctor George Andreoff, MD knew of the patient's comorbid illnesses. Because the patient was COVID positive and had a documented tachycardia the day Dr. Andreoff saw the patient for an encounter on 9/10/2021, he should have given thorough and specific instructions to the staff regarding close observation and when to send the patient to the ED. However, it does not appear he was ever notified of Mr. Short's declining condition on September 13th.

3) Was deliberate indifference exhibited in the care of Mr. Short?

a. Yes. The jail medical staff continued to ignore his symptoms and failed to take them seriously. The following nurses exhibited deliberate indifference, and disregard for Timothy Short's condition: Nurses Johansson, Cox, Hohl, and Cook. They prevented Mr. Short from receiving care from either the on-call doctor or the ED by their actions and/or inactions outlined in my report.

i.   Megan Johansson, LPN failed to respond on 9/13/2021. The patient was noted to be taking shallow breaths and hypoxic with oxygen saturation between 84%-87% (St. Charles County Jail medical record, confidential SCC 000369). She felt he was malingering and over-representing his symptoms. She placed him on oxygen without subsequently obtaining a physician's order, or discussing the fact that a COVID patient with several comorbid issues was now hypoxic and had a new oxygen requirement.

ii.  Nurse Jami Hohl, RN failed to respond on 9/13/2021 and comments that he seemed to be faking his symptoms. She stated he was not in any distress. Yet, she documents that he had "shallow breathing which appeared to be intentional." (St. Charles County Jail medical records, confidential SCC 000368). If a patient has COVID and associated heart disease, obesity, and OSA, nurse Hohl must be aware that, if she is incorrect in her assumptions, the result could be dangerous, even deadly. She deliberately ignored his complaints and appeared indifferent to his symptoms. Furthermore,  she states that she never examined the patient, but she was documenting for Nurse Nicole Cook. In addition, this was documented the following day which all violates the guidelines for the Missouri Board of Nursing.

iii. Nurse Nicole Cook, RN failed to respond on 9/13/2021 and in addition contradicts statements made by Nurse Hohl. She states she never assessed Mr. Short that evening, never saw an oxygen tank in his room, never allowed a nurse to document for her, and never asked Nurse Hohl to document for her. She states that Jami Hohl examined Timothy Short.

iv.  Jandi Cox, RN was deliberately indifferent
     1. when she decided to transfer Mr. Timothy Short by officer transport rather than emergency medical services (EMS). She sent an email September 14, 2021, stating that Timothy Short "…needs to be transported to the ER via

car for an abnormally low oxygen level (with no improvement when placed on oxygen) …" (Jail Email Correspondence; SCC000338). This is entirely inappropriate. She placed an unstable patient who is hypotensive, and on oxygen, and in respiratory distress in a vehicle with no monitors, and with officers who cannot assist him in route if his status declined. If he had stopped breathing or went into cardiac arrest, which was entirely possible, he would have died in route to the ED. Nurse Cox had to know that this was a possibility. If he had gone by EMS transport, he could have had an IV placed in route, be given a breathing treatment, and administered intravenous steroids prior to ED arrival. In addition, EMS transport would have been much more efficient because there was a significant delay between the time that Nurse Cox requested officer transport and when they actually took him to the hospital.

2. Megan Johansson asserts that it was the supervisor's duty (Jandi Cox) to notify Dr. Andreoff of the new oxygen requirement and Jandi Cox stated that in her deposition that the nurses were allowed to contact the physician on their own at any time. Whichever version is true simply highlights the deliberate indifference of either nurse.

v. In addition, St. Charles County and Accountable Healthcare are responsible. They both were equally responsible for the safety of detained patients residing at the St. Charles County Jail. Mr. Short's declining condition would be apparent to any responsible person, even one without medical training. In my experience working within similar institutions, the jail staff would have the ability to take steps to protect Mr. Short, including seeking to transfer him to a hospital. There is no evidence in the records that the jail staff did anything other than defer their responsibility for Mr. Short's safety to the medical staff. This despite the fact neither the County, nor Accountable Healthcare, did anything to ensure that the

medical staff was appropriately trained in caring for patients infected with the COVID-19 virus, such as Mr. Short, or ensure appropriate care was rendered to similar patients. Therefore, it is clear they all were deliberately indifferent to Mr. Short's declining medical condition.

4) Did the delay in care cause or contribute to cause the death of Timothy Short?

   a. Yes. Appropriate medical care was delayed. In fact, not only was it delayed but Mr. Short was treated inappropriately. On September 14th, when he was transferred to the ED, he was hypotensive. Yet, nursing staff inappropriately administers his blood pressure medications. Furthermore, he should have been transferred by ambulance to the hospital. It is inappropriate to transfer a patient with respiratory distress, on supplemental oxygen, with unstable vital signs by officer transport. Had Mr. Short received appropriate, and prompt medical intervention as described above, my opinion within a reasonable degree of medical certainty is that he more likely than not would have survived.

   b. ARDS is a life-threatening condition that is associated with COVID-19, and patients with OSA, such as Mr. Short, are at particular risk. ARDS can take a week or simply hours to develop. Therefore, any delay in care could be life threatening (https://www.yalemedicine.org/conditions/ards). Therefore, if Mr. Short had been sent to the ED on September 13th, then more likely than not, he would have survived.

5) Was the treatment Mr. Short received at St. Joseph hospital reasonable and necessary to treat and stabilize his condition, and were they in accordance with accepted standards for his condition and diagnosis?

   a. Yes. I reviewed the treatment and medications he received while in the hospital, and he received standard medical therapy for COVID-19, ARDS, pneumonia, sepsis, respiratory failure, and kidney failure.

6) Were the medical costs that Mr. Short accrued at St. Joseph Hospital appropriate and necessary for treatment and stabilization of his condition?

    a. Yes. Timothy short was in the hospital for nearly one month. During this time, he was treated in the emergency department, and the critical care intensive care unit (ICU). He received intravenous medications, 24/7 nursing care, x-rays, and CT scans. He was seen by multiple physicians, surgeons, and other specialists, and was intubated, placed on a ventilator, and underwent a tracheostomy due to prolonged ventilation.

    b. I have reviewed the charges on Mr. Short's medical bill and based on my experience with emergency room and hospital charges, I believe those charges were reasonable.

7) If Mr. Short had been transferred to the ED on September 13, 2021, would that have impacted the duration of his treatment at the hospital?

    a. Yes. Treatment for sepsis and ARDS must be instituted immediately. A delay in hours can mean the difference between life and death. This is the reason we have sepsis guidelines in the ED and are required to start antibiotics within one hour of recognition. This is considered the "golden hour." Therefore, if one hour is considered important in reducing mortality and morbidity, how much more is one day? If Mr. Short had been transferred to the ED on September 13th, then more likely than not, he would have had a better outcome, and a shorter hospital duration.

    b. Had Mr. Short been transferred to the ED on September 13th, 2021, his hospital treatment would still have been prolonged and arduous. However, it is more likely than not he would have survived his hospital stay and discharged home alive.

**Conclusion**

Timothy Short died because of delay of appropriate care. The medical department and staff ignored his symptoms and the seriousness of them. They did not consider his comorbid illnesses and how they would contribute to his illness. The medical staff should have appropriate training to understand when a patient with COVID who has these types of health issues needs a higher level of care. The COVID-19 virus was well underway by this time, and there were accepted standards of care. The NIH published standards of care and guidelines for treatment and had these been followed and been part of the jail's protocols, then Mr. Short would have been sent much sooner to the hospital to receive treatment. The NIH suggested that if, "Patients with persistent or progressive dyspnea, especially those who have an Sp02 $\leq$ 94% on room air at sea level or have symptoms that suggest high acuity (e.g. chest pain or tightness, dizziness, confusion, or other mental status changes), should be evaluated by a health provider." (pg. 41, covid19treatmentguidelines.nih.gov). Additionally, the National Commission on Correctional Health Care (NCCHC) published January 12, 2021, clinical care guidelines for COVID-19 patients. They state that COVID-19 presents with "silent hypoxia" wherein patients have low oxygen levels but do not look or feel as sick as would normally be expected. They also suggested escalated care if the pulse oximetry is $\leq$ 94%. (Clinical Care of the COVID-19 Patient, Jan 12, 2021). They recommend chest x-rays early in the course of illness, and they emphasize that, "People of color, significantly overrepresented in jails and prisons, are also generally at higher risk for hospitalization and death due to the disease." (Clinical Care of the COVID-19 Patient, Jan 12, 2021). Simply take a moment to imagine how different Timothy Short's care and outcome would have been, had the county, jail, and nurses been following the nationally accepted recommendations and guidelines of expert institutions such as the CDC, NIH, and NCCHC. It would have altered the course of his care and saved his life. They should be held accountable and responsible for his death, the cost of his care, and the deliberate indifference and violation of his constitutional rights.

It was common knowledge that patients with cardiac and pulmonary illnesses would be affected disproportionately. Therefore, the lack of apparent training, high index of suspicion, and failure to listen to the patient contributed to him getting worse and was the cause of his ultimate demise. Every day, there was an opportunity to intervene in his care. Yet, every day without appropriate care his chances of survival diminished. This was most significant on September 13th when Mr. Short's condition significantly declined. He received no appropriate physician evaluation, blood work, chest x-ray, or EKG for 6 days.

In addition, there is also racial disparity and socioeconomic factors affecting poor outcomes. Incarcerated patients are an at-risk population and particularly vulnerable to poor outcome since they have no ability to access care on their own, they have more chronic illnesses, and there is lack of continuity of care once they transition back into the communities (Reviewing The Flaws of U.S. Prisons and Jails' Health Care System; Emily Wang 2023). Black people also make up approximately one third of those incarcerated even though they only represent 16% of the population (Pew Research Center, April 30, 2019), and the death rate for incarcerated patients with COVID during the pandemic was approximately three times higher than the free population. In Missouri, in 2020, there was a 70% rise in death rate per 10,000 people in prison (Officials Failed to Act When COVID Hit Prisons. The Marshall Project, April 18, 2024). Finally, blacks are more likely to receive substandard care due to cognitive biases (The Impact of Racism on Clinician Cognition, Behavior, and Clinical Decision Making, Michelle van Ryn, et al., doi: 10.1017/S1742058X11000191).

Therefore, when Mr. Short was incarcerated the odds of survival were stacked against him. He received a delay in care, substandard care, and no diagnostic testing to investigate other etiologies of his symptoms. He received no medical treatment to address his comorbid issues such as his cardiac disease, and obstructive sleep apnea. He was denied his prescribed cardiac medications and had no access to proper respiratory ventilation with a CPAP machine. His care was not only medically negligent, but he was denied access to treatments which could have stabilized his condition before he became septic and developed Acute Respiratory Distress Syndrome.

This was a violation of his Eighth Amendment rights, and they had to be aware that their actions, or rather failure to act, could cause substantial risk or harm to his health which is the very definition of deliberate indifference (https://definitions.uslegal.com/d/deliberate-indifference/).

Documentation was lacking, inaccurate, falsified, and/or in violation of nursing protocols and guidelines set forth by the Missouri Department of Health & Senior Services. There was no documentation after the patient saw Dr. Andreoff on September 10th, nor any attempt to contact a provider except on the 14th of September when he was transferred to the ED. Jami Hohl and Nicole Cook contradict each other's recollection as to who assessed Mr. Short on September 13th, and Nurse Hohl violated nursing guidelines by documenting after the fact, most likely in fear of possible legal ramifications, and clearly was dishonest in the assessment stating that Timothy Short's oxygen saturation was 99% on 2 liters of oxygen which is unlikely. Megan Johansson administered oxygen to Mr. Short for hypoxia but did not notify Dr. Andreoff of this treatment or of the new oxygen requirement and decline in the patient's health. Her actions violated Missouri nursing guidelines, and potentially were illegal since this would be practicing medicine without a license. Oxygen is a medication and requires a prescription. It is documented that Jandi Cox emailed Nurse Hohl when Mr. Short was sent to the ED inquiring as to why he was never assessed during their shift. He made this allegation, and it most likely is true which means he went most of the night without supplemental oxygen, or any supportive care while suffering and fearing for his life while suffering from the onset of sepsis, multifocal pneumonia and ARDS.

Timothy Short was a victim of deliberate indifference. This was apparent in the decisions, actions, lack of care and confirmed in depositions with Nurse Johansson, Hohl, Cook, and Cox. The most critical time to intervene would have been September 13th which was the day prior to transfer to the hospital. He was administered oxygen for hypoxia, but he needed much more than this. No doctor was consulted, there was no further evaluation, testing, or treatment performed. He received no assessment that evening, suffered with no oxygen throughout the night, and then transferred to the following day by officer transport rather than by EMS. This was reckless disregard. If he had been treated appropriately on September the 13th, and had the medical department followed their own policies and protocols, more likely than not, Mr. Short would have survived.

Finally, Mr. Short died nearly one month after being admitted to the hospital and amassing a medical bill of over $400,000. Therefore, not only did his wife and family lose a loved one, and a provider, but they acquired a bill approaching half a million dollars as a result of the negligence, substandard care, and civil rights abuse that their father, and husband suffered, at the hands of the nurses, doctors, and the county jail who simply get to wash their hands of it and walk away. Afterall, according to the documentation and depositions of Megan Johansson, Nicole Cook, and Jami Hohl, he was just faking it. (Daily cost of an intensive care unit day: the contribution of mechanical ventilation, Crit Care Med. 2005 Jun;33(6):1266-71, Joseph F Dasta. DOI: 10.1097/01.ccm.0000164543.14619.00).

_Joel Blackburn_                                      July 1, 2024
Dr. Joel Blackburn                                    Date