UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| I'ESHA SHELTON SHORT, | ) | |
| *spouse of Timothy Short, deceased,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-CV-1117-ZMB |
| | ) | |
| ST. CHARLES COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Following her husband's death from COVID-19 complications, Plaintiff I'Esha Short (I'Esha) brought this action seeking damages for the medical care he received at the St. Charles County Jail. This matter is now before the Court on several motions jointly filed by some or all Defendants, including two motions to exclude expert opinions, Docs. 119, 121; two motions for summary judgment, Docs. 123, 128; and a motion for judgment on the pleadings, Doc. 126. While I'Esha concedes that her expert cannot opine on certain topics and implicit-bias testimony is not appropriate, Defendants fail to establish any basis for excluding her expert's opinions as to medical causation. Further, because Defendants did not even attempt to show good cause for failing to adhere to the case management order, the Court will not entertain their motion to strike certain rebuttal opinions as a discovery sanction. As for summary judgment, I'Esha has not provided sufficient evidence to support either the bulk of her deliberate-indifference claims or liability for Defendants Accountable Health Staffing (AHS) and St. Charles County. But the Court denies summary judgment as to Defendants Jamie Forstner and Nicole Cook because I'Esha has identified a material dispute of fact as to whether they were deliberately indifferent to a serious medical condition. Finally, the Court grants judgment on the pleadings for two categories of damages as unopposed.

## BACKGROUND

### I.        Relevant Facts[1]

I'Esha's husband, Timothy, was arrested on identity-theft charges and taken to St. Charles County Jail on September 9, 2021. Doc. 145 ¶ 39; Doc. 148 ¶¶ 1–2. Upon arriving at the jail, Timothy reported that he had tested positive for COVID-19. Doc. 148 ¶ 2. The jail placed him in an isolation cell while awaiting test results to confirm the COVID diagnosis. *Id.* ¶ 4. The next day, the jail received confirmation from the lab and entered the positive result in their logs. *Id.* ¶¶ 8, 12. The Delta variant was prevalent at the time and was potentially deadly because it caused rapid decompensation in some patients. *Id.* ¶ 3.[2] Timothy suffered from several comorbidities that increased his risk, including heart disease and obesity. Doc. 148 ¶ 10.

During his time at the jail, Timothy was checked on regularly—roughly twice each day. Doc. 147 ¶ 18. Nurses routinely took vital stats, including his oxygen-saturation levels. *See id.* ¶¶ 16–20. Timothy was generally stable from September 10 through 12, with his oxygen saturation in the low-to-mid 90s. Doc. 148 ¶¶ 13, 16, 19–20. Still, Timothy began to develop other symptoms, including loss of taste, loss of smell, and shortness of breath. *Id.* ¶ 11. He reported these symptoms to the jail nurses. *Id.* ¶ 16.

---

[1] The Court accepts as true the allegations admitted in the various Answers, Docs. 101–106, and the uncontroverted facts from each Statement of Uncontroverted Material Facts (SUMF), Docs. 125, 129, 148; *see* E.D. MO. L.R. 4.01(E) ("All matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."); FED. R. CIV. P. 56(c)(2). Additionally, Defendants assert various objections to I'Esha's factual allegations, either based on the admissibility or the contents of the evidence she cites in support. For purposes of this order, the parties can assume that the Court has overruled any objection to a fact that is included in this order, even if not expressly addressed.

[2] Defendants object that Dr. Parsons's testimony is inadmissible because he "lacks foundation to speculate as to whether the nurses at the [County] . . . had knowledge of this variant of COVID-19." Doc. 162 ¶ 3; *see also* Doc. 158 ¶ 3 ("Dr. Parsons lacks foundation to speculate to any of the individual nurses' actual subjective understanding of the variant . . . ."). But Nurse Forstner corroborated that testimony, *see* Doc. 149-9 at 33 (confirming that nurses understood that the variant at the time was dangerous and life threatening), and Defendants do not contest "that the COVID19 Delta variant was a potentially deadly disease for some patients," Doc. 158 ¶ 3.

Around 2:00 p.m. on September 13, Nurse Johansson visited Timothy after he complained to a guard that he was having trouble breathing. *Id.* ¶ 25. Johansson measured Timothy's oxygen saturation, which came in markedly lower, around 84–87%. *Id.* ¶ 27. At the time, National Institutes of Health guidelines indicated that a COVID patient showing less than 94% oxygen saturation was "considered to have severe illness" and "may experience rapid clinical deterioration." Doc. 145 ¶ 6. Johansson believed that Timothy was not complying with her requests to take deep breaths and that he might be faking his inability to breathe. Doc. 148 ¶¶ 27–28. Nevertheless, she placed him on supplemental oxygen at 3 liters per minute. *Id.* ¶ 29. The oxygen was supplied by a tank with a limited supply.[3] *Id.* ¶¶ 31–32. Johansson also alerted her supervisor, Nurse Cox, about Timothy's lower oxygen levels and that she had placed Timothy on a tank. *See id.* ¶ 38. Neither of them alerted the treating physician. *Id* ¶ 37.

That evening, Nurse Forstner (née Hohl) learned that Timothy had COVID, was on oxygen, and needed to be monitored. *See id* ¶¶ 46–47, 49. At this point, the accounts of what occurred diverge significantly. Forstner recalls delegating the task of checking on Timothy to Nurse Cook, Doc. 162 ¶ 75, who reported oxygen saturation levels of 99%, *see* Doc. 149-9 at 92–93; Doc. 149-15 at 14. For her part, Cook claims she accompanied Forstner, who conducted an examination. Doc. 148 ¶ 76. Cook also asserts that she believed Timothy was isolation for a detox and not for COVID, *id.*, but remembers little else about this interaction, Doc. 149-20 at 59–60. Lastly, Timothy informed staff the next morning that he was not seen by anyone on September 13, Doc. 148 ¶ 49–50, and there is no contemporaneous record of the visit, *see id.* ¶ 63.

---

[3] The parties dispute whether Timothy was given oxygen through a tank or a concentrator, which is significant because the latter device can provide an unlimited supply of oxygen. *See* Doc. 158 ¶ 31; Doc. 162 ¶ 31. Despite Defendants' arguments to the contrary, there is a genuine dispute as to which device was used. And given that a reasonable jury could conclude that Timothy was on an oxygen tank, *see* Doc. 149-11 at 68–70 (testifying that the jail did not own an oxygen concentrator), the Court must assume that I'Esha's allegations are true because they affect the causation analysis.

The next morning, Johansson checked on Timothy again. *Id.* ¶ 56. This time, his oxygen levels fell to 79%. Doc. 148 ¶ 59. Despite Johansson increasing the flow of air, Timothy's oxygen saturation increased to only 86%. *Id.* ¶ 60. At that point, a nurse called a physician, who referred Timothy to the hospital. *Id.* ¶¶ 61–62. Cox also emailed Forstner and asked for an explanation of why Timothy was not seen the night before. *Id.* ¶ 63. In response, Forstner completed an assessment note, which stated that Cook assessed Timothy the night before. *Id.* ¶ 72.

About an hour after the doctor referred him to the ER, Timothy was taken to the hospital by squad car. *Id.* ¶ 65. Johansson indicated that Timothy was not showing signs of distress when he left the jail. *Id.* ¶ 68. But hospital staff noted that he was "hypoxic" and in "moderate distress" upon arrival. *Id.* ¶ 69. He was later administered critical care and found to have multi-focal COVID-19 pneumonia. *Id.* ¶¶ 70–71. A few days later, Timothy was placed on a ventilator and developed multi-organ failure. *Id.* ¶ 85. Timothy died at the hospital a month later. *Id.*

## II.    Procedural History

I'Esha filed this case in late 2022. Doc. 1. She subsequently amended her complaint, leaving only Defendants Cox, Forstner, Johansson, Cook, St. Charles County, and AHS—an outside contractor that provides nursing staff for the County's jail. Doc. 99 ¶¶ 11–18. I'Esha brings two claims under 42 U.S.C. § 1983: one for deliberate indifference to a serious medical need by each of the nurses (Count I), and another for supervisory liability against Cox and municipal liability against the County and AHS (Count II). *Id.* ¶¶ 110–138. Following discovery, all Defendants moved to exclude the opinions of I'Esha's expert, Dr. Joel Blackburn, Docs. 119, 121, and for summary judgment, Docs. 123, 128. Additionally, the County, Cox, and Forstner moved for judgment on the pleadings as to punitive damages against the County and for damages related to I'Esha's own injuries. Doc. 126. I'Esha opposed all but the last of these motions, Docs. 134–135, 138, 144, 146, and Defendants filed replies, Docs. 136–137, 160–61.

## LEGAL STANDARD

### I.      Summary Judgment

Summary judgment must be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "When deciding a motion for summary judgment, a court is required to view disputed facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in its favor." *Sherr v. HealthEast Care Sys.*, 999 F.3d 589, 597 (8th Cir. 2021) (citation omitted). Courts may not "weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Morris v. City of Chillicothe*, 512 F.3d 1013, 1018 (8th Cir. 2008) (citation omitted). Instead, "the focus is on whether there are genuine issues of material fact for trial." *Sherr*, 999 F.3d at 597 (citation omitted).

"A genuine issue for trial exists when a reasonable jury could return a verdict for the nonmoving party." *Huber v. Westar Foods, Inc.*, 139 F.4th 615, 620 (8th Cir. 2025) (quotation omitted). "Substantive law in the relevant area dictates which facts are material, as only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Sherr*, 999 F.3d at 597 (quotation and alteration omitted). While the initial burden rests with the movant, once a motion is properly supported, the non-movant "has an affirmative burden to designate specific facts creating a triable controversy." *Midwest Oilseeds v. Limagrain Genetics Corp.*, 387 F.3d 705, 714 (8th Cir. 2004). Thus, when the parties offer conflicting versions of the facts, the court must adopt the non-movant's version unless it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Thompson v. King*, 730 F.3d 742, 749 n.3 (8th Cir. 2013).

## II.    Qualified Immunity

Government officials accused of violating civil rights under section 1983 are entitled to assert the defense of qualified immunity, which shields them from liability. Qualified immunity applies unless the plaintiff shows "(1) [the official] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable offic[ial] would know of the right at the time of the alleged violation." *Maser v. City of Coralville*, 139 F.4th 1004, 1009 (8th Cir. 2025) (quotation omitted). This doctrine "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions and protects all but the plainly incompetent or those who knowingly violate the law." *Parker v. Chard*, 777 F.3d 977, 979–80 (8th Cir. 2015) (quotation omitted). "[B]ecause the focus is on whether the officer had fair notice that the conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014) (quotation omitted). In assessing whether a right is clearly established, "there does not have to be a previous case with exactly the same factual issues," but the right also "should not be defined at a high level of generality." *Williams v. City of Burlington*, 27 F.4th 1346, 1352 (8th Cir. 2022) (quotations omitted).

## III.    Expert Testimony

The admissibility of expert opinions is governed by Federal Rule of Evidence 702. In assessing a motion to exclude such testimony, the Court "plays the role of a gatekeeper" as to relevance and reliability. *Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012). Expert opinions are admissible if they meet three criteria. First, the evidence must be relevant—that is, "useful to the finder of fact in deciding the ultimate issue of fact." *Acad. Bank. v. AmGuard Ins.*, 116 F.4th 768, 790 (8th Cir. 2024). "Second, the proposed witness must be qualified to assist the finder of fact," *id.*, meaning that the expert's "education and experience demonstrate a knowledge of the subject matter," *Moe v. Grinnell College*, 547 F. Supp. 3d 841, 846 (S.D. Iowa 2021) (citation omitted). Finally, the "evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Acad. Bank.*, 116 F.4th at 790.

6

**DISCUSSION**

Defendants have filed a series of motions to avoid or limit trial in this matter. Specifically, they move to exclude Dr. Blackburn as an expert, to strike portions of his rebuttal report, for summary judgment, and for judgment on the pleadings. The Court will address each in turn.

**I.      Motion to Exclude Dr. Blackburn**

Defendants first move to exclude the testimony of I'Esha's lone expert, Dr. Blackburn, Doc. 119, a former medical director at a jail with extensive experience in emergency medicine. Doc. 134 at 5. Defendants seek to exclude the whole of Dr. Blackburn's testimony or, alternatively, his opinions on causation, implicit bias, legal conclusions, witness credibility, and medical bills. Doc. 120. While I'Esha opposes the motion with respect to Dr. Blackburn's opinions on causation and implicit bias, she agrees that Dr. Blackburn cannot testify as to legal conclusions, witness credibility, or medical bills. Doc. 134. The Court agrees that Dr. Blackburn is qualified to testify regarding medical causation, so there is no basis for excluding his testimony entirely. However, as I'Esha at least partially concedes, Dr. Blackburn's opinions regarding cognitive bias, legal conclusions, credibility, and damages are either irrelevant or beyond his qualifications.

*a. Dr. Blackburn can testify as to medical causation.*

Defendants offer three main arguments for why Dr. Blackburn cannot testimony regarding causation. First, they contend that Dr. Blackburn lacks relevant expertise. Second, Defendants argue that Dr. Blackburn utilizes unreliable principles and methods or that he unreliably applies his methodology to the facts. Third, Defendants suggest that Dr. Blackburn's opinions provide little probative value. While the Court has misgivings about the tone and conclusory nature of much of Dr. Blackburn's report, I'Esha has sufficiently established his qualifications to offer expert testimony as to medical causation in light of the "liberal thrust" of Rule 702. *See Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014) (quotation omitted).

7

Defendants first argue that Dr. Blackburn lacks expertise to testify as to causation. In particular, they emphasize that he "did not practice medicine in a correctional setting during the COVID-19 pandemic," specialize in various relevant fields, or conduct research into COVID. Doc. 120 at 4. Defendants further allege that Dr. Blackburn's "background in emergency medicine does not qualify him to opine on the complex progression of COVID-19" to assess whether it caused Timothy's death. *Id.* I'Esha counters that Dr. Blackburn's experience does not need to "precisely align with the factual scenario" of Timothy's case and emphasizes his qualifications as "an emergency room physician who treated hundreds of patients during the COVID pandemic and formerly served as the long-time medical director at the Boone County Jail." Doc. 134 at 3, 8–9.

Defendants' arguments are without merit. As I'Esha suggests, there is no requirement for "perfect symmetry between an expert's experience and the precise subject matter of their testimony," so long as "the expert's background equips him to help the jury understand the facts or issues in dispute." *Minnesota v. Fleet Farm LLC*, 2025 WL 2802243, at *6 (D. Minn. Oct. 1, 2025) (citation omitted). Dr. Blackburn is a board-certified physician with expertise in corrections medicine, Doc. 134-1 at 2–3, and extensive experience treating COVID, Doc. 149-40 at 15–16. And while Dr. Blackburn may lack expertise in some relevant specialties, "a doctor's opinion should not be excluded merely because it involves a field of medicine that he does not specialize in." *Leus v. C,R, Bard, Inc.*, 2021 WL 4313607, at *7 (W.D. Mo. Sep. 22, 2021) (citation omitted). Thus, the fact that he did not practice medicine in a correctional facility during the COVID pandemic may prove fertile ground for cross-examination, but it does not override his relevant expertise. As such, Dr. Blackburn's testimony is not excludable on that basis.

Next, Defendants challenge Dr. Blackburn's principles and methodology on four grounds. Doc. 120 at 4–10. First, Defendants contend that Dr. Blackburn failed to consider alternative explanations for Timothy's death, including his decision to "remain unvaccinated," his "non-

8

compliance with his healthcare needs," and the "substantial intervening medical care that [he] received at a hospital." *Id.* at 5. But an expert is not excludable "merely because [he] has not ruled out every possible alternative cause for the plaintiff's medical condition." *Gilliland v. Novartis Pharms. Corp.*, 34 F. Supp. 3d 960, 967 (S.D. Iowa 2014) (collecting cases). Moreover, Dr. Blackburn *did* consider the bulk of the alternative causes that Defendants highlight. Doc. 149-40 at 161–62 (vaccination status); Doc. 149-15 at 14, 22 ("noncompliance" with his CPAP machine); *id.* at 23 (intervening medical care). Second, Defendants contend that Dr. Blackburn "cannot reliably conclude under oath that any alleged delay in escalation of care . . . caused Mr. Short's death" because he discounted whether earlier administration of medication could have prevented that outcome. Doc. 120 at 6. While Dr. Blackburn opined that earlier administration of the drug *alone* would not have changed the outcome, Doc. 149-40 at 231–32, he indicated that Timothy needed a combination of interventions and that earlier admission to the hospital would have prevented his death, Doc. 149-15 at 23. In any event, "an expert's contradictions or concessions go toward the weight of the evidence put forth by the expert, not toward its admissibility." *Kirksey v. Oriental Trading Co.*, 2026 WL 657834, at *6 (D. Neb. Mar. 9, 2026) (collecting cases). Third, Defendants claim that Dr. Blackburn offered only impermissible "sooner is better" testimony. Doc. 120 at 7–9. In reality, he testified that earlier and more extensive intervention would "more likely than not" have prevented Timothy's death. Doc. 149-15 at 19. Finally, Defendants claim that Dr. Blackburn's testimony is not supported by medical literature. Doc. 120 at 10. But "[w]hile published studies tending to support an expert's opinion often are a hallmark of admissible testimony, . . . there is no requirement that a medical expert must always cite published studies on general causation." *Damgaard v. Avera Health*, 104 F. Supp. 3d 983, 987 (D. Minn. 2015) (citation omitted). Thus, Defendants fail to show why Dr. Blackburn should be excluded on the basis of unreliable methodology.

Finally, Defendants contend that Dr. Blackburn's testimony is more prejudicial than probative. Doc. 120. Relying on their previous arguments, Defendants incorrectly claim that Dr. Blackburn's opinions "necessarily lack[] meaningful probative value" and are therefore irrelevant

and should be excluded under Rule 403. *Id.* at 10. For unfair prejudice, they note that Dr. Blackburn gave testimony that moderately contradicted his report. *Id.* at 11. But the "contradiction" can be harmonized in that Defendants' line of questioning isolated only one component (drugs) while not rebutting Dr. Blackburn's conclusion that Timothy needed a combination of drugs and ventilation. In other words, this argument goes to credibility, not admissibility, *see Kirksey*, 2026 WL 657834, at *6, and can be appropriately remedied by cross-examination. In sum, Dr. Blackburn's testimony as to causation is admissible because he has relevant expertise, is sufficiently reliable, and will not create undue prejudice.

### b.   Dr. Blackburn's opinions as to implicit bias are excludable under Rule 702.

Defendants also argue that Dr. Blackburn's testimony regarding implicit bias should be excluded under Rule 702. First, they argue that Dr. Blackburn lacks the specialized knowledge or expertise to comment on cognitive bias. Doc. 120 at 13. Further, because this is a deliberate-indifference claim, they claim that any implicit bias evidence is irrelevant as it would not aid the jury in determining if the Defendants had a "conscious disregard of a known risk." *Id.* I'Esha did not address the former argument. Instead, she argued that Dr. Blackburn should be allowed to comment on inconsistent testimony, the "potential problems caused by jail nurses who disbelieve detainees," and other similar issues. Doc. 134 at 15. Defendants counter that these arguments do not address their underlying claim that Dr. Blackburn lacks a basis to make these assertions and that the testimony is irrelevant. Doc. 136 at 7–8.

Defendants are right that Dr. Blackburn cannot testify as to implicit bias. As an initial matter, it is far from clear how implicit bias testimony would be relevant to the key issues underlying a deliberate-indifference claim, which requires a *conscious* awareness of a serious medical need. *See Cox v. Callaway Cnty.*, 2020 WL 1669425, at *5 (W.D. Mo. Apr. 2, 2020)

10

(barring Dr. Blackburn from opining on implicit bias in jails as irrelevant for a deliberate-indifference claim). More importantly, as the proponent of his opinion, I'Esha "must show by a preponderance of the evidence both that [Dr. Blackburn] is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." *Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010) (quotation omitted). But Dr. Blackburn's own testimony reveals that, while he lectured in the area of cognitive bias in prison medicine, he is not otherwise qualified in this area. *See* Doc. 149-40 at 211. As such, even if otherwise relevant, the Court excludes this portion of Dr. Blackburn's opinions.

### c. Dr. Blackburn cannot opine on credibility, legal conclusions, or medical bills.

Defendants also note that Dr. Blackburn impermissibly commented on witness credibility in his report and during his deposition, offered opinions as to legal conclusions, and commented on medical bills. *See* Doc. 120 at 11–12, 14. I'Esha agrees that Dr. Blackburn cannot offer those kinds of opinions. *See* Doc. 134 at 15–17. As such, the Court grants as unopposed the request to exclude those portions of Dr. Blackburn's opinions.

## II.    Motion to Strike Dr. Blackburn's Rebuttal Report

Next, Defendants ask the Court to strike portions of Dr. Blackburn's rebuttal report addressing the Nurse Defendants, claiming that he should have included these opinions in his initial report. Doc. 122 at 3. But as I'Esha notes, Dr. Blackburn added these opinions only after Defendants designated the four nurses as non-retained experts, which happened well after he issued his original report. Doc. 135 at 1–2. She contends that the rebuttal report does not contain new opinions and, even if so, it would not be procedurally improper. *Id.* at 3–4. Additionally, I'Esha offered Defendants the chance to re-depose Dr. Blackburn, *id.* at 5, which they declined, insisting that "[t]he prejudice is inherent," Doc. 137 at 3.

11

Defendants' arguments fall short for multiple reasons. First, given that they seek a discovery sanction under Rule 37(c), Doc. 121, the operative case management order required them to first "file a memorandum requesting a video conference with the Court." Doc. 107 ¶ 3(g)–(h). But no such request was made, and Defendants also failed to comply with the Court's good-faith certification requirement. *See* E.D. MO. L.R. 3.04(A). Nor have Defendants even attempted to show good cause for making this request after the discovery-motion deadline. *See* Doc. 107 ¶ 3(h); *Cheeks v. Belmar*, 162 F.4th 899, 907 (8th Cir. 2025) (emphasizing that the application of the good-cause standard is "not optional"). These procedural deficiencies alone are a sufficient basis for denying relief. *See Wilbur-Ellis Co. v. Gompert*, --- F.4th ---, 2026 WL 1957820, at *5 (8th Cir. 2026). But the motion also fails on the merits. After Defendants designated the nurses as experts, I'Esha was free to buttress Dr. Blackburn's opinions to address the expanded categories on which the nurses could testify, and the challenged opinions were limited to the subjects outlined in the nurses' disclosures. *See* Doc. 135-1. Thus, these opinions were timely under Rule 26(a)(2)(D)(ii), and even if they were not, any delay was substantially justified, *see* FED. R. CIV. P. 37(c)(1). Moreover, while Defendants' claim that "prejudice is inherent," Doc. 137 at 3, their argument rings hollow given that they fail to explain how they were adversely affected beyond the opportunity for a deposition, which they declined. Therefore, the Motion to Strike is denied.

## III.    Motions for Summary Judgment and Judgment on the Pleadings

Next, all Defendants move for summary judgment on both counts. With the exception of the claims against Forstner and Cook, Defendants are entitled to summary judgment.

### a.  *Deliberate-Indifference Claims*

In Count I, I'Esha asserts that Cox, Johansson, Forstner, and Cook were deliberately indifferent to Timothy's serious medical condition, which ultimately resulted in his death. Doc. 99 ¶¶ 110–125.

12

The Due Process Clause of the Fourteenth Amendment guarantees a pretrial detainee the right to medical care, with asserted violations analyzed under the same framework as equivalent Eighth Amendment claims. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (collecting cases). To establish deliberate indifference, a plaintiff must meet an objective and subjective component. *Id.* The objective prong requires proof of an objectively serious medical need—a need that is "either obvious to the layperson or supported by medical evidence, like a physician's diagnosis." *Starks v. St. Louis Cnty.*, 159 F.4th 1146, 1149 (8th Cir. 2025) (quoting *Cannon v. Dehner*, 112 F.4th 580, 586 (8th Cir. 2024)). For the subjective component, the pretrial detainee must "show that the defendant actually knew of, but deliberately disregarded" their objectively serious medical need. *McRaven v. Sanders*, 577 F.3d 974, 980 (8th Cir. 2009) (quotation omitted). This prong requires "a mental state akin to criminal recklessness." *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) (quotation omitted). "[T]he failure to treat a medical condition [is not cognizable] unless prison officials knew that the condition created an excessive risk to the inmate's health and then failed to act on that knowledge." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).

While I'Esha establishes the objective prong, she does not identify a material dispute of fact about whether Cox and Johansson subjectively disregarded the risks associated with Timothy's medical condition. However, construing the facts and drawing all reasonable inferences in I'Esha's favor, neither Forstner nor Cook provided any care to Timothy despite knowing about his needs. As such, the Court denies summary judgment to Forstner and Cook but grants it as to Cox and Johansson.

### 1. Objective Component

Cox and Forstner[4] first argue that Timothy did not suffer from an objectively serious medical need until he was assessed by a physician on September 14. *See* Doc. 124 at 6–7. I'Esha

---

[4] Cook and Johansson expressly declined to contest the objective prong in their original memorandum. Doc. 130 at 4 n.1. Their belated attempt to raise this argument in reply comes too late, Doc. 160 at 3, and the Court deems this issue waived for present purposes. *See Mohammed v. Creighton Univ.*, 2025 WL 3642067, at *17 (D. Neb. Dec. 16, 2025) (citing *United States v. Cooper*, 990 F.3d 576, 583 (8th Cir. 2021)).

13

counters that the jail was aware of Timothy's COVID diagnosis days earlier and that the nurses witnessed firsthand his worsening symptoms over the course of his stay. Doc. 144 at 11–12. Moreover, she notes that the Delta variant was considered a serious medical condition, particularly given Timothy's comorbidities and dropping blood-oxygen levels. *Id.* at 11–13. She is right.

Whether a medical condition meets the objective component of a deliberate-indifference claim is generally an issue of fact. *Dalen v. Harpstead*, 123 F.4th 900, 904 (8th Cir. 2024). The objective component is supported by evidence that the condition complained of was "either obvious to the layperson" as requiring care "or supported by medical evidence." *Starks*, 159 F.4th at 1149.

After viewing the disputed facts and drawing all reasonable inferences in I'Esha's favor, the Court finds that Timothy suffered from an objectively serious medical condition—at a minimum— after his oxygen-saturation levels dropped to the mid-80s on September 13. Although Cox and Forstner suggest that the physician's diagnosis did not occur until September 14, *see* Doc. 124 at 6, that assertion is contradicted by the record. Timothy tested positive for COVID no later than September 10, Doc. 149-2 at 34, and that result was entered into the jail's record system the same day, *id.* at 14. Indeed, the evidence on which Cox and Forstner rely—Document 125-12—indicates that hospital believed Timothy's COVID "diagnosis was 09/08/2021." *Id.* at 7. At least some courts have found that a COVID diagnosis alone is sufficient to meet the objective prong of a deliberate-indifference claim. *See Scharnhorst v. Cantrell*, 2023 WL 7137372, at *8 (W.D. Ark. Oct. 10, 2023) (collecting cases). But here, Defendants further concede that the variant of COVID was potentially deadly, Doc. 162 ¶ 3, that Timothy suffered from several comorbidities, *id.* ¶ 10, and that COVID patients need supplemental oxygen when oxygen saturation falls below 90%, Doc. 125 ¶ 10; *see also* Doc. 149-9 at 44–45. Given the particular risks Timothy had related to his COVID infection, the objective prong of the deliberate-indifference claim is met.

14

### 2. Subjective Component—Johansson

With the objective prong met, the Court turns to the subjective component for each of the Nurse Defendants. Johansson argues that the summary-judgment record demonstrates that she lacked the mental state for deliberate indifference. Upon noticing that Timothy was low on oxygen, she treated the condition by providing supplemental oxygen and elevating care to her supervisor, Cox. Doc. 130 at 6. She then concluded that Timothy was stable, and at the end of her shift she told other nurses to keep an eye on him. Doc. 147 ¶¶ 33, 36. While acknowledging that Johansson provided "some treatment" by giving Timothy oxygen, I'Esha suggests that she "left Mr. Short in a state of emergency instead of sending him to the hospital or even calling a doctor." Doc. 146 at 13–14. I'Esha also contends that Johansson's bias-fueled assessment that Timothy was faking his shortness of breath is indicative of deliberate indifference, as is the fact that she knew the oxygen supply would run out before another nurse saw him. *Id.* at 14–15.

Even if I'Esha could show that Johansson acted unreasonably, there is no basis for finding deliberate indifference. *See Thompson v. King*, 730 F.3d 742, 747 (8th Cir. 2013). Despite her belief that Timothy was malingering, Johansson determined that he was in need of oxygen and that is what she gave him. She then promoted continuity of care by alerting others nurses that Timothy was on oxygen and needed to be monitored. While I'Esha believes that Johansson should have called a doctor, a nurse's failure to notify a physician after determining a nonemergent condition exists does not constitute deliberate indifference. *Cannon v. Dehner*, 112 F.4th 580, 589 (8th Cir. 2024). That failure is, at most, negligence or a misdiagnosis, but both fall short of the mental state necessary for deliberate indifference. *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015). And while Dr. Blackburn may take issue with Johansson's course of treatment in retrospect, her actions are insufficient to reach the state of mind necessary for a deliberate-indifference claim. *See Christianson v. McLean Cnty.*, 176 F.4th 1076, 1084–85 (8th Cir. 2026) (affirming summary judgment for a nurse who misdiagnosed detainee but otherwise provided medical care). As such, Johansson is entitled to summary judgment.

15

### 3. *Subjective Component—Cox*

Like Johansson, Cox argues that there is insufficient evidence to show she had the requisite mental state for the subjective prong. *See* Doc. 124 at 7–10. Unsurprisingly, I'Esha again contends that Cox needed to call a doctor once she learned of Timothy's need for oxygen. Doc. 144 at 14. Like Johansson, Cox alerted other nurses to Timothy's condition, *id.* at 8, but she perceived the condition as not emergent through September 13 and acted accordingly, Doc. 145 ¶ 81. Once again, I'Esha has not shown that these actions constitute a constitutional violation. As such, Cox is entitled to summary judgment in her favor.[5]

### 4. *Subjective Component—Forstner*

For her part, Forstner claims entitlement to summary judgment, both on the merits and based on qualified immunity. Forstner argues that she "did not intentionally delay or refuse treatment," as Timothy was assessed on September 13 and "maintained an oxygen saturation level of 99%"—meaning there was "no clinical indication to contact a physician or escalate [his] care." Doc. 124 at 11. I'Esha suggests otherwise,[6] noting that Forstner was "advised of Mr. Short's condition" but failed to treat him or otherwise ensure he had supplemental oxygen. Doc. 144 at 15–16. Relying on a disputed treatment record, Forstner insists that the "only variance concerns which nurse physically performed the assessment, not whether it occurred." Doc. 161 at 8. But her attempt to paper over this and other factual disputes as "minor discrepancies in recollection" cannot save her bid for summary judgment. Doc. 161 at 7–8.

---

[5] I'Esha also asserts that the delay in sending Timothy to the hospital, as well as the decision to use a car instead of an ambulance to transport him, are a further basis for her claim against Cox. Doc. 144 at 18. For the reasons explained below, *infra* at 23, this claim similarly fails.

[6] I'Esha contends that, even if Forstner or Cook did see Timothy on September 13, they could be liable because they "did not call a doctor for Mr. Short or send him to the hospital." Doc. 144 at 16; Doc. 146 at 16. But I'Esha fails to identify even contested facts suggesting that Forstner or Cook subjectively concluded that Timothy was not in stable condition after visiting him. Thus, this alternative basis of liability is unsupported by the factual record.

As an initial matter, it is undisputed that Forstner was subjectively aware of Timothy's serious medical condition. Based on her conversation with Cox, Forstner knew that Timothy was placed on oxygen and needed a COVID assessment. *See* Doc. 149-21 at 1. She also acknowledged her understanding that low oxygen was a life-threatening condition. *See* Doc. 149-9 at 44–45. Thus, the only relevant issue is whether Forstner or Cook attended to Timothy that night.

After viewing the disputed facts and drawing all reasonable inferences in a light most favorable to I'Esha, the Court is compelled to assume that neither Forstner nor Cook saw Timothy on September 13, meaning he went without oxygen for roughly 20 hours. For one thing, Timothy himself complained to staff that he was not seen by anyone on that night.[7] But even setting that aside, the nurses themselves created a fact dispute through their inconsistent testimony. Forstner recalls that she delegated the task of assessing Timothy to Cook that night, Doc. 149-9 at 115–16, but Cook directly contradicts her account, insisting that she accompanied Forstner, who completed the assessment, Doc. 149-20 at 45. While acknowledging "there are differing memories between Nurse[s] Cook and [Forstner] on who performed the evening assessment", Doc. 130 at 9, Defendants ask the Court to assume that *someone* visited Timothy, *see* Doc. 161 at 7. But that would be drawing an inference in their favor and against I'Esha, which the Court cannot do at

---

[7] Forstner and Cook object to this statement under Rule 56(c)(2), claiming that the source email contains multiple levels of hearsay. Doc. 158 ¶ 49; Doc. 162 ¶ 49. Specifically, they identify two levels: "a statement attributed to another nurse and Mr. Short." *See, e.g.*, *id.* When an objection under Rule 56(c)(2) is made, "the burden is on the proponent of the evidence to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Gannon Intern. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012). At the same time, the Eighth Circuit has also held that a district court did not abuse its discretion in overruling a hearsay objection at summary judgment where the objecting party failed to specifically identify why the information could not have been presented in any admissible form. *Id.* And ultimately, the burden is simply to show that the evidence "*could* be presented at trial in an admissible form." *Id.* (citing FED. R. CIV. P. 56(c)(2)). At this stage, particularly given the lack of substantive briefing devoted to the issue, the Court finds that the evidence at least potentially could be presented in an admissible form. As I'Esha notes, Timothy's statement arguably was made for medical treatment under Federal Rule of Evidence 803(4). Doc. 163 at 12. Moreover, the existence of an intermediate declarant does not appear on the face of the email, and while the identity of the second declarant is unclear at this stage, it is plausible that I'Esha could identify that member of the jail staff and produce their testimony at trial. However, if Defendants believe that I'Esha has failed to lay sufficient foundation or demonstrate that a hearsay exception applies for purposes of trial, they may reassert their objection at that time. *See Vanicek v. Kratt*, 2023 WL 5403292, at *7 (D. Neb. Aug. 22, 2023) (adopting similar approach).

summary judgement. *See HCI Distrib. v. Peterson*, 110 F.4th 1062, 1067 (8th Cir. 2024) ("Nor may [the Court] draw [] inferences in favor of [] the party seeking summary judgment."). Instead, it must draw the equally permissible conclusion that neither nurse checked on Timothy on the night of September 13. *See Wiertella v. Lake Cnty.*, 141 F.4th 775, 782 (6th Cir. 2025) (affirming a denial of summary judgment where two nurses disputed who was responsible for treating a patient because the evidence, properly construed, made both potentially liable).

Moreover, even if the dueling testimony were not enough, circumstantial evidence supports an inference that no one saw Timothy that night. Forstner did not create a visit record until the day after the alleged interaction, Doc. 149-2 at 4, and she did so only after receiving an email from Cox asking why no saw Timothy the night before, Doc. 149-21. Further, she indicated that Cook actually performed the assessment, Doc. 149-2 at 4; Doc. 149-21, but Forstner knew she was allowed to record only her own observations and was required to do so in a timely manner, Doc. 149-9 at 80–81. Stranger still, Forstner charted that Timothy was "in no distress" and had an oxygen percentage saturation level of 99. Doc. 149-2 at 4. Dr. Blackburn asserts this level of increase in Timothy's oxygen saturation was impossible. Doc. 149-15 at 14, Doc. 149-40 at 129. Further, the fact that the chart lacks any entry that he received his other medication that evening further indicates that no one saw him. *See* Doc. 149-17 at 75.

On a final note, given these significant factual disputes, qualified immunity cannot save Forstner at this stage. "When a defendant asserts qualified immunity at the summary judgment stage, the plaintiff must produce evidence sufficient to create a genuine issue of fact regarding whether the defendant violated a clearly established right." *Bishop v. Glazier*, 723 F.3d 957, 961 (8th Cir.2013). In September 2021, it was "clearly established . . . that a *complete* failure to treat an extremely painful (or other serious) condition displays a reckless indifference to a serious

18

medical need." *Leonard v. St. Charles Cnty. Police Dep't*, 59 F.4th 355, 363 (8th Cir. 2023) (citing

*Dadd v. Anoka County*, 827 F.3d 749, 757 (8th Cir. 2016)); *see also Presson v. Reed*, 65 F.4th 357,

367 (8th Cir. 2023) (same for intentional delay in access to care). On a proper reading of the factual

record, Forstner did not provide care for a known, life-threatening condition—meaning there is

sufficient evidence to establish a deliberate-indifference claim. And because the constitutional

violation rests on a dispute of fact, the Court cannot grant Forstner qualified immunity at this stage.

*See Coker v. Ark. State Police*, 734 F.3d 838, 842 (8th Cir. 2013).[8]

### 5. *Subjective Component—Cook*

For similar reasons, Cook is not entitled to summary judgment.[9] Like Forstner, if Cook

failed to treat Timothy despite knowing his condition, it would constitute deliberate indifference.

The Court will assume that no one treated Timothy on the evening of September 13 for the reasons

stated above. Thus, the dispositive issue for Cook is whether she actually knew of Timothy's

serious medical condition.

Cook claims that she lacked any subjective awareness, citing to her testimony that she "was

under the impression that Mr. Short was in the isolation cell for 'detox' purposes and was wholly

unaware of his COVID status." Doc. 130 at 9. She bolsters her claim by pointing out that her usual

responsibilities did not involve treating COVID-positive detainees *Id.* at 11. In response, I'Esha

advances circumstantial evidence to undercut Cook's contention. Specifically, she points to

---

[8] Forstner also claims she cannot be liable for her inaction because she has immunity under the PREP Act. Doc. 124 at 13–14. The argument is without merit. The PREP Act was created to allow "during times of crisis the development and deployment of medical countermeasures," *Hampton v. California*, 83 F.4th 754, 762 (9th Cir. 2023), and creates immunity for "any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure." 42 U.S.C. § 247d-6d(a)(2)(B). But Forstner cannot benefit from this immunity because the claim is that she *failed* to provide treatment. *See Hampton*, 83 F.4th at 763–65 (finding that the failure to administer COVID tests was not "administration" of a countermeasure to preclude liability for a deliberate-indifference claim).

[9] Because Cook did not raise qualified immunity as a defense in the instant motions and has never asserted it as a defense, the Court will not address that issue.

electronic evidence showing that Cook examined Timothy's chart when it would show him as COVID positive, that Forstner tasked Cook with performing a COVID assessment, and that Cook's testimony is "utterly irreconcilable" with Forstner's version of events. Doc. 146 at 15–16. Cook responds that the audit trail is inadmissible and that "none of the 'facts' provided by [I'Esha] dispute [her] testimony that she was unaware that Mr. Short had COVID-19." Doc. 160 at 7.

On this posture, there is a genuine dispute as to whether Cook had the requisite knowledge of Timothy's condition, as knowledge can be based on either direct or circumstantial evidence. *See Vaughn*, 557 F.3d at 908. While Forstner was initially responsible for Timothy's care, the Court must credit her recollection that she delegated the task to Cook in light of the fact dispute. Doc. 149-9 at 94. And although Cook claims she was under the impression that this was a detox round, Doc. 149-20 at 46–47, a reasonable jury could conclude that Cook knew that Timothy both had COVID and needed oxygen because she accessed Timothy's chart at least twice after his diagnosis was added to the jail's records as well as the fact that Forstner delegated his care to her, *see* Doc. 149-5 at 114, 128.

Cook resists this conclusion by claiming that the "audit trail" is inadmissible and must be ignored for present purposes. *See* 160 at 8. Specifically, Cook claims that I'Esha has not laid a foundation for the admissibility of the audit trail and "has not properly authenticated the document as required" by Rule 901. Doc. 162 ¶ 15. But her argument is unpersuasive. For one thing, "[d]ocuments produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating." *Norambuena v. W. Iowa Tech. Cmty. Coll.*, 773 F.Supp.3d 628, 639 (N.D. Iowa 2025) (collecting cases). Further, while Cook complains that I'Esha has not *currently* authenticated the documents, I'Esha has identified multiple individuals who can lay a foundation, Doc. 163 at 11, so there is no basis for concluding that the audit trail

20

"*could not* be presented at trial in an admissible form." *See Oglesby v. Lesan*, 929 F.3d 526, 534–35 (8th Cir. 2019) (affirming a district court's consideration of evidence for summary judgment that the opponent claimed was not presently authenticated). Thus, viewing the record in the light most favorable to I'Esha, there is a genuine dispute as to whether Cook knew about Timothy's condition but failed to treat him. Cook's motion for summary judgment is denied.[10]

### 6. Causation

Defendants also argue that I'Esha cannot show that their actions harmed Timothy. Doc. 124 at 4–5. Because Dr. Blackburn's testimony supports a finding that the lack of treatment on September 13 caused Timothy's demise, I'Esha has presented enough evidence to support causation. But she has failed to establish causation on the other remaining theory—that Cox should have sent Timothy to the hospital by an ambulance.

When a deliberate-indifference claim rests on a delay in treatment, "the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." *Laughlin v. Schriro*, 430 F.3d 927, 929 (8th Cir. 2005) (quotation omitted) "To establish this effect, the inmate must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment" of his condition. *Id.* (quotation omitted). Generally, issues of causation in a deliberate-indifference claim are "question[s] of fact," but the Court may decide it as a matter of law "where the causal link is so tenuous as to justify taking it from the trier of fact." *Schaub*, 638 F.3d at 921 (citation omitted). "A plaintiff's failure to place

---

[10] Cook also insists that I'Esha cannot recover punitive damages against her because the facts do not show that she acted in an evil manner. Doc. 130 at 18. The argument presumes that a jury would find that she did, in fact, provide care or that there is no liability for deliberate indifference. *See id.* To be entitled to punitive damages under section 1983, I'Esha must show that Cook's conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Schaub v. VonWald*, 638 F.3d 905, 922 (8th Cir. 2011). Given that a jury could conclude that Cook provided no care to Timothy despite knowing of an objectively serious medical need, summary judgment as to punitive damages is not warranted. *See Presson v. Reed*, 65 F.4th 357, 370 n.7 (8th Cir. 2023) (affirming the denial of summary judgment on punitive damages because issues of fact remained).

verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs." *Cheeks*, 80 F.4th at 878 (quotation omitted). But "expert testimony that the plaintiff suffered because of a delay in treatment would satisfy the requirement." *Dantlzer v. Baldwin*, 133 F.4th 833, 844 (8th Cir. 2025) (quotation omitted).

First, Defendants resist the conclusion that I'Esha has established causation as to Forstner and Cook's failure to treat Timothy on September 13. Their arguments on this front track their motion to exclude Dr. Blackburn and rely on the fact that Timothy received treatment at the hospital and at least temporarily recovered there. Doc. 124 at 4–5; Doc. 130 at 17. But as stated above, Dr. Blackburn opined that the delay in providing certain interventions, including ventilation, caused Timothy's death. And because of the failure to treat Timothy on the night of September 13, he would have run out of supplemental oxygen overnight and developed pneumonia as a result. Doc. 149-40 at 164; Doc. 149-15 at 9. The existence of alternative causal factors does not make the causal link so tenuous as to take the issue from the jury. *See Gilliland*, 34 F. Supp. 3d at 967. Finally, given that Dr. Blackburn indicated that the development of COVID pneumonia made it "too late," Doc. 149-15 at 10, a jury could conclude the lack of care caused his death. As such, summary judgment is not warranted.

However, I'Esha fails to establish causation with respect to Cox's decision to send Timothy to the hospital by car instead of by ambulance. Significantly, as Cox notes, Dr. Blackburn did not opine that the decision to transport Timothy in this manner caused his death. Doc. 124 at 9. Dr. Blackburn merely described the transportation decision as "inappropriate." Doc. 149-15 at 17–18. But he also acknowledged that Timothy was transported with oxygen, and there is nothing to suggest that any of the risks he identified actually occurred. Doc. 149-40 at 142–44. While I'Esha

22

contends that a "significant delay in providing emergency treatment demonstrates deliberate indifference," Doc. 144 at 18, she does not cite to verifiable medical evidence supporting the theory that the one-hour delay in transport contributed to Timothy's death. Absent that evidence, Cox is entitled to summary judgment as to this decision.

### b. *Supervisory and Municipal-Liability Claims*

In Count II, I'Esha brings what she describes as "wrongful death" claims against Cox, the County, and AHS. Doc. 99 ¶¶ 126–138. She alleges that Cox failed to supervise the other nurses and that both the County and AHS are liable for having an unconstitutional policy or custom, or for failure to train. *Id.* All three Defendants moved for summary judgment on these grounds. Because there is not enough evidence to support liability, they are entitled to summary judgment.

#### 1. *Supervisory Liability for Cox*

Cox claims that she is entitled to summary judgment on Count II because she cannot be liable under a theory of supervisory liability. Doc. 124 at 12–13. Specifically, she argues that I'Esha "has produced no evidence to support any element of Plaintiff's supervisory liability claim." *Id.* at 13. I'Esha did not respond to these arguments.

To establish a supervisory liability claim, I'Esha must show that Cox "(1) had notice of a pattern of unconstitutional acts committed by [Forstner and Cook]; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury." *Mitchell v. St. Louis Cnty.*, 160 F.4th 950, 961 (8th Cir. 2025). But I'Esha has not put forward any evidence that the actions of Forstner and Cook extended beyond this single, isolated instance. *See Lenz v. Wade*, 490 F.3d 991, 995–96 (8th Cir. 2007) ("A single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability." (alterations omitted)). Nor has she otherwise explained why liability applies. As such, there is not enough evidence to support a claim of supervisory liability against Cox.

23

## 2. *Municipal Liability Against St. Charles County*

The County likewise asserts that I'Esha failed to produce any evidence to demonstrate an unconstitutional policy or custom.[11] Doc. 124 at 15–17. I'Esha makes a passing reference to all three possible grounds for municipal liability: "(1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." Doc. 144 at 18. But she abandoned the bulk of these theories, as her only material response in opposition to summary judgment relates to an unconstitutional policy. *See id.* at 18–20. I'Esha takes issue with the policy that nurses were not permitted to contact a physician or send a detainee to the hospital when confronted with emergent medical situations. *Id.* at 19. She also identifies the failure to transport Timothy to the hospital by ambulance as establishing liability against the County. *Id.* at 20.

When analyzing an unconstitutional-policy claim, "[the] first inquiry . . . [is] whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Marsh v. Phelps Cnty.*, 902 F.3d 745, 751–52 (8th Cir. 2018). As such, I'Esha "must prove that the policy was the 'moving force' behind [the] constitutional violation." *Id.* at 752. That requires evidence demonstrating a "direct causal link between a policy or custom . . . and the alleged constitutional deprivation." *Wagner v. City of St. Louis Dep't Pub. Safety*, 4:12-CV-1901-AGF, 2014 WL 3529678, at *12 (E.D. Mo. July 16, 2014) (citation omitted). Here, the constitutional violation is Forstner and Cook's failure to administer care to Timothy's known, life-threatening condition. But the policy identified—requirements for calling a physician and hospital transportation—are not the constitutional violations involved. Thus, even if those policies led to

---

[11] I'Esha also asserts official-capacity claims against Forstner and Cox, which Defendants assert are redundant of her claim against the County. Doc. 124 at 5 n.2. The Court grants their request for dismissal of the official-capacity claims as unopposed. *See Banks v. Slay*, 875 F.3d 876, 880–81 (8th Cir. 2017); *see also Marshall v. Coleman*, 2024 WL 7014607, at *1 (E.D. Ark. 2024) (dismissing "a plausible deliberate indifference claim" asserted against government officials in their official capacities because Eighth Circuit precedent dictates that a county cannot be held vicariously liable for the acts of its employees under section 1983).

24

the decisions the nurses made, they did not result in the violation of Timothy's constitutional rights. Indeed, neither Cook nor Forstner had anything to do with failing to call a physician or an ambulance. As such, there is no connection between the policies and the constitutional violation, meaning the County is entitled to summary judgment on the *Monell* claims.

### 3. *Municipal Liability Against AHS*

Similar to the County, AHS claims it cannot be held liable for Cook's actions. As relevant here,[12] AHS asserts that it cannot be held liable under *Monell* because the County establishes the policies and practices for AHS nurses, and it was unaware of any ongoing constitutional violations. Doc. 130 at 15–16. In response, I'Esha contends that AHS is liable because it agreed to supply nurses who would provide adequate care but failed to adopt policies or train its staff. Doc. 146 at 19–20. AHS responds that there is "no evidence that AHS has any control over County policy, procedures, or trainings for nurses AHS supplied" and "no evidence presented that policies or training caused or contributed to the deliberate indifference alleged." Doc. 160 at 13. I'Esha has not put forward evidence to establish *Monell* liability, and her claim fails for two reasons.

First, AHS is correct that it cannot be liable for an unconstitutional policy or custom. "An action can constitute official municipal policy only if the decisionmaker in question possesses final authority to establish municipal policy with respect to the action ordered." *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016). I'Esha did not dispute that "AHS does not develop, approve, or supervise to ensure compliance with protocols, policies, procedures, and training manuals for the St. Charles County Correctional Facility." Doc. 147 ¶ 97. Indeed, AHS nurses followed Cox—a County nurse—as the supervisor, and they followed the County's policies for providing care at the St. Charles County Jail, not AHS's policies. *See id.* ¶¶ 101–05. As such, AHS was not a final decisionmaker for the purposes of any unconstitutional policy or custom.

---

[12] AHS also argues that it is not a state actor and, thus, cannot be liable under section 1983. *See* Doc. 130 at 14–15. For the purposes of this order, the Court assumes without deciding that AHS is a state actor.

Second, I'Esha's failure-to-train argument similarly fails. For this claim, I'Esha needed to show that: the training was inadequate; AHS "was deliberately indifferent to the rights of others in adopting these training practices," which constituted a "deliberate and conscious choice[]"; and the "alleged training deficiencies cause[d] [Timothy's] constitutional deprivation." *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1061 (8th 2013). But to prove deliberate indifference, I'Esha must show that AHS "had notice that its procedures were inadequate and likely to result in a violation of constitutional rights." *Jennings v. Wentzville R-IV Sch. Dist.*, 397 F.3d 1118, 1122 (8th Cir. 2005). "A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Sarich v. Missouri*, No. 4:23-CV-943-SEP, 2025 WL 901276, at *3 (E.D. Mo. Mar. 25, 2025) (quotation omitted). Here, I'Esha does not contend that there was such a pattern. Thus, a factfinder could not conclude that AHS had any notice of constitutional violations to show that it made the conscious choice to allow violation of those rights. Accordingly, I'Esha cannot establish liability against AHS and summary judgment is granted in its favor.

### c. *Motion for Partial Judgment on the Pleadings*

Finally, Cox, Forstner, and the County move for judgment on the pleadings concerning two categories of damages. First, they argue that I'Esha cannot recover damages she experienced in her own right under the section 1983 claims she brings on behalf of Timothy. Doc. 127 at 1. Second, the County claims it is not subject to punitive damages. *Id.* To her credit, I'Esha acknowledged that Eighth Circuit precedent bars both forms of recovery and "decided not to press [either] argument." Doc. 138 at 1–2. As such, the Court grants this portion of Defendants' motion as unopposed.[13]

---

[13] Notably, this ruling does not resolve punitive damages against the other Defendants. *See* Doc. 138 at 1 ("Of course, plaintiff does reserve the right to request that a punitive damages instruction be submitted to the jury as to the other defendants, though that is an issue to be taken up at a later stage of these proceedings.").

## CONCLUSION

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' [119] Joint Motion to Exclude Dr. Blackburn's Report and Testimony and **DENIES** Defendants' [121] Joint Motion to Strike Improper Portions of Plaintiff's Expert's Rebuttal Report. Further, the Court **GRANTS** Defendants' [123] [128] Motions for Summary Judgment with respect to Defendants St. Charles County, Megan Johansson, Jandi Cox, and Accountable Health Staffing and **DENIES** the motions with respect to Defendants Jami Forstner and Nicole Cook. Finally, the Court **GRANTS** as unopposed the County, Cox, and Forstner's [126] Motion for Judgment on the Pleadings.

The Clerk of Court is directed to lift the stay previously entered in this case. Doc. 164.

So ordered this 9th day of July 2026.

ZACHARY M. BLUESTONE
UNITED STATES DISTRICT JUDGE